UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Koray Ergur; Ergur Private Equity Group, LLC, A Delaware Series, LLC; Ergur Holdings, LLC, A Delaware Series LLC; | ) ) ) |
| | **CV 13 5136** |
| Plaintiffs, | ) Case No. |
| | ) |
| vs. | ) COMPLAINT |
| | ) |
| The Spitzer Building Company, An Ohio Corporation, Patrice Spitzer, Signature Associates, Inc., A Michigan Corporation, John Spitzer, Richard Ellis, Bill Thomas, Sabrina Crabtree, Louisville Title Company,  The Port Lawrence Title and Trust Company,   Lucas County Treasurer, and Does 1 to 100 inclusive, | ) ) ) ) ) ) ) |
| | ) DEMAND FOR JURY TRIAL |
| | ) |
| Defendants. | ) ) |

**COMPLAINT FOR (1) BREACH OF FIDUCIARY DUTY; (2) BREACH OF CONTRACT(3) BREACH OF IMPLIED CONTRACT (4) BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING; (5) UNFAIR BUSINESS PRACTICE TITLE (6) FRAUD(7) INTENTIONAL INTERFERENCE (8) ACCOUNTING (9) REQUEST FOR TEMPORARY AND PERMANENT INJUNCTION**

Koray Ergur an individual, and Ergur Private Equity Group, LLC, a Delaware  Series

Limited Liability Company, and Ergur Holdings, LLC, a Delaware  Series Limited Liability

company, bring this complaint against the defendants and each of them allege as follows:

**JURISDICTION AND VENUE**

1.    Plaintiff Koray Ergur is, and at all times relevant was, a citizen of California residing in

San Francisco County, California.

- 1 -

2.    This is a civil action seeking damages and injunctive relief for breach of fiduciary duty, breach of contract, breach of the covenant of good faith and fair dealing, unfair business practice, intentional interference, accounting, fraud, defamation and embezzlement.

3.    The court has jurisdiction under 28 U.S.C.A. § 1332.

4.    Plaintiff Koray Ergur is a citizen of California. Plaintiffs Ergur Private Equity Group, LLC and Ergur Holdings, LLC are corporations incorporated under the laws of the State of Delaware and have their principal place of business in the state California. Plaintiffs Ergur Private Equity Group, LLC and Ergur Holdings, LLC are doing business in California.

5.    Defendants Patrice Spitzer, Sabrina Crabtree, Bill Thomas, and John Spitzer are citizens of Ohio. Defendant Spitzer Building Company is a corporation incorporated under the laws of the state of Ohio. Defendant Signature Associates, Inc. is a corporation incorporated under the laws of the state of Michigan. The amount in controversy exceeds $75,000.00 exclusive of interest and costs.

## GENERAL ALLEGATIONS

6.    Plaintiff, Koray Ergur, is and was at all times pertinent hereto an individual who resides in San Francisco, California.

7.    Plaintiff, Ergur Private Equity Group, LLC ("EPEG"), is a Delaware Limited Liability Company, with a business address of 1290 Bayshore Hwy, STE 230, Burlingame, California, 94010.

8.    Plaintiff, Ergur Holdings, LLC, ("EH") is a Delaware Limited Liability Company, with a business address of 1290 Bayshore Hwy, STE 230, Burlingame, California, 94010.

9.      Defendant, The Spitzer Building Company, an Ohio Corporation ("SBC"), was and, at all times mentioned herein, a Corporation duly authorized to conduct business in the State of Ohio and maintains a place of business at 520 Madison Avenue, Suite 420, Toledo, OH 43604.

10.     Defendant, Signature Associates, a Michigan Corporation ("SA"), was and, at all times mentioned herein, a Corporation duly authorized to conduct business in the State of Michigan and maintains a place of business at One Towne Square, Suite 1200 Southfield, MI 48076.

11.     Defendant, John Spitzer, is and was at all times pertinent hereto an individual who resides in Boulder , Colorado.

12.     Defendant, Sabrina Crabtree, is and was at all times pertinent hereto an individual who resides in Toledo, Ohio.

13.     Defendant, Bill Thomas, is and was at all times pertinent hereto an individual who resides in Toledo, Ohio.

14.     Defendant Port Lawrence Title and Trust Company ("PLTT") is an unknown entity doing business as Port Lawrence Title and Trust Company with a principal place of business 616 Madison Ave, Toledo, Ohio.

15.     Defendant Louisville Title Company of N.W. Ohio, Inc., an Ohio Corporation ("LTC"), was and, at all times mentioned herein, a Corporation duly authorized to conduct business in the State of Ohio and maintains a place of business at 626 Madison Avenue, Toledo OH 43604.

16.     Plaintiffs are ignorant of the true names and capacities of each defendant sued herein as Does 1 to 100 inclusive and therefore sue these Defendants by such fictitious names. Plaintiff will amend this Complaint to include the true names and capacities of those defendants when they have been ascertained.

17.     Plaintiff are informed and believe and thereon allege that at all times herein mentioned each Defendant sued herein claims an interest in the subject property and each such Defendant was the agent and employee of each of the remaining Defendants thereof and at all times each such Defendant was acting within the purpose and scope of such agency and employment.

18.     Whenever an allegation regarding any act of the Defendants is made herein, such allegation shall be deemed to mean the act of each defendant acting individually or with corporate authorization, jointly and severally.

## PRELIMINARY ALLEGATIONS

19.     At all times herein mentioned Plaintiff, EPEG was and is the owner of a commercial office building property known as the "Nicholas Building" and commonly described as 608 Madison Avenue, 319 North Huron, 321 North Huron, 323 North Huron, Toledo, OH 43604, (hereinafter the "Nicholas Building").

20.     At all times herein mentioned Plaintiff, EPEG, was and is the owner of a commercial office building property known as the "Spitzer Building" and commonly described as 520 Madison Avenue, Toledo, Ohio 43606 (hereinafter the "Spitzer Building").

21.     EPEG acquired the Nicholas Building through a public auction held on December 14, 2007 and has been the owner of the property since that date. EPEG acquired the Spitzer Building through a purchase and sale from SBC, with the close of escrow on April 13, 2009. SBC, as part of the purchase and sale, became a lender to EPEG, secured by a mortgage contract.

22.     On or about January 7, 2009, SBC agreed in writing that the closing date for the sale of the Spitzer Building to EPEG would be postponed for up to ninety (90) days. Attached hereto and marked as Exhibit "A" is a true and correct copy of the letter agreement between SBC and EPEG. In that agreement, at paragraph 4, EPEG was to have "the benefit of rental receipts that

Buyer would have received under the terms and conditions of the Purchase Agreement" as if the closing had taken place on January 5, 2009. The parties closed escrow on April 13, 2009. Attached hereto and marked as Exhibit B is a copy of the closing statement for the Spitzer Building.

23. Pursuant to the January 7, 2009 agreement, EPEG was to receive the benefits of the rental receipts from January 5, 2009 through April 13, 2009. After April 13, 2009, EPEG was to assume complete control of the property and to continue to receive the benefits of the rental receipts from the Spitzer Building as the new owner. In fact, SBC and Defendants never turned over any receipts to EPEG and tried to keep control over the operation of the Spitzer Building. The unpaid rental receipts total approximately $326,000 for the period of 1/5/09 to 4/13/09.

24. EPEG installed its own property management team in April 2009. However, Defendants sabotaged the efforts of EPEG's property management team causing, in June 2009 EPEG's on-site property management to resign. The new manager chosen by EPEG was an undisclosed friend of Lyman Spitzer of SBC and was his wife, now widow, Patrice Spitzer.

25. Defendants colluded to take control over the Nicholas Building, taking advantage of EPEG being an out-of-town owner, manipulating the on-site activities at the Nicholas Building to create financial crisis. Ultimately, EPEG acquiesced to SBC and Defendants control over the two properties, which was to be done for the mutual benefit of EPEG and SBC.

26. EPEG and Signature Associates entered into a written agreement regarding the management of the Nicholas building. Said agreement is attached hereto and Exhibit C and incorporated by reference herein. Signature Associates acted as selling broker.

27. EPEG acquiesced in SBC and its agents keeping control over the Spitzer Building because SBC and Defendants induced EPEG to agree to SBC running the operations of the

Spitzer Building for the mutual benefit of both SBC and EPEG. SBC and Defendants induced EPEG to enter into this arrangement with assurances that SBC would become a co-investor with EPEG in the redevelopment of the Spitzer Building. SBC agents represented that the Spitzer Building would be professionally and properly managed for the benefit of EPEG, the building's owner.

28.    In January 2009, Defendants engaged the services of Signature Associates, Inc. as property managers. At the time of the engagement, the rental receipts for the Nicholas building approximated $90,000.00 a month. During the management of the property by SA, the income dropped to $30,000. Instead of paying the expenses, Signature Associates embezzled the income, demanded money from Defendants, slandered and libeled defendants by stating they were failing to pay bills, made false statements to local newspapers about defendants, falsified records, impersonated Koray Ergur and requested the gas be shut off, and drove the tenants out of the building. The Nicholas building is now empty because of defendants Signature Associates, SBC, Patrice Spitzer, John Spitzer, Sabrina Crabtree, Richard Ellis and Bill Thomas.

29.    Defendants, acting as property managers, had substantial control over all aspects of the operation of the Spitzer Building and the Nicholas Building since 2009. Defendants maintained control of the accounts payable and accounts receivable for both the Nicholas and the Spitzer Buildings since 2009. Sabrina Crabtree and Patrice Spitzer collected the rent checks, deposited them, and were signatories on the bank accounts.

30.    Defendants, each of them, caused rental income from the Nicholas and Spitzer Building to be deposited in the Spitzer Building Company and other personal bank accounts not belonging to defendants. The loss to plaintiffs total approximately $3,838,000.

31.    Contrary to the assertions SBC and Defendants, SBC did not manage the Spitzer Building fairly and property on behalf of EPEG. As early as April 20, 2009, Defendants attempted to interfere with the rehabilitation plans for the two buildings. Defendants interfered by refusing to turn over money owed EPEG and disseminating false financial information on the financial health of EPEG. Defendant actively sought out "new buyers" and prepared false accounts payable information to accomplish their goal of disrupting the rehabilitation plans developed by EPEG. Defendants offered misleading advice in their capacity as attorneys or lenders. Defendants have refused to provide an accurate accounting of the income and expenses of the two buildings and failed to disclose the numerous code violations that existed at the two properties prior to the close of escrow.

32.    In April, 2009, at the recommendation of EPEG, SBC and Defendants agreed that tenants in the Spitzer Building be moved to the Nicholas Building so that EPEG could refurbish the Spitzer Building. SBC insisted that EPEG give SBC a first mortgage on the Nicholas Building in order to for SBC to cooperate in moving the tenants. This mortgage transaction was unusual and forced upon Plaintiffs because Spitzer and Defendants exercised control over the Spitzer Building although EPEG was its owner. EPEG therefore agreed to the lien and recorded it with a view to increasing the tenancy at Nicholas Building and refurbishing the Spitzer Building.

33.    On April 20, 2009, one week following the close of the execution of the cross collateralization second mortgage on the Nicholas Building on April 13, 2009, SBC reneged on its commitment to move tenants from the Spitzer Building to the Nicholas Building, thereby interfering with Plaintiffs rehabilitation plan for the two buildings. Defendants then proceeded with their previously undisclosed plan to obtain title to both the Nicholas Building and the Spitzer Building at foreclosure or at a distressed price.

- 7 -

34.     As part of Defendants' undisclosed plan to foreclose or obtain title to the two properties
at a distressed price, SBC and Does 1 through 100 falsely accounted for utility charges in an
effort to disrupt service to the Buildings and chase out tenants. In the year 2007, the Toledo
Edison bill was approximately $40,000.00. After EPEG obtained title to the property, the Toledo
Edison Bill exceeded $200,000.00 and Toledo Edison threatened to deny service to the Nicholas
Building.

35.     The Defendants were acting as lender, property managers, bookkeepers and accountants
for Plaintiffs from January 2009 through the present day and in doing so owed Plaintiffs a
fiduciary duty not to gain an unfair advantage or deliberately sabotage Plaintiffs plans to
rehabilitate the two buildings. As a result of the substantial control maintained by Defendants,
and the fact that plaintiffs were out of state, they were in a position to interfere with Plaintiff
tenants and service providers such as Toledo Edison for the purpose of acquiring or foreclosing
on the two properties. In doing so, SBC breached a fiduciary duty to Ergur as his lender,
property manager and bookkeeper.

36.     In 2011, the property manager chosen by Lyman Spitzer, Patrice Spitzer sought
appointment by the court as receiver citing disrepair and significant income reduction. The court
granted appointment and ordered her to pay the taxes, insurance, and maintain the property
among other things. (The court order is attached hereto as Exhibit D and incorporated herein)

37.     In January 2011, citing the manufactured financial crisis and disrepair of the property,
Patrice Spitzer in her capacity as receiver asked the court for a judicial foreclosure judgment.

38.     Prior to and after her appointment, receiver Spitzer directly managed both the Nicholas
building and Spitzer building revenues and accounts. In fact, she and her husband managed the
properties for approximately five years before the interest transferred to plaintiffs. Prior to the

- 8 -

transfer of ownership the revenues from the building approximated 800K a year. To date they approximate 120K. (See Exhibit E attached hereto and incorporated by reference herein)

39.     After the Spitzer property transferred interest, receiver Spitzer breached her fiduciary duty by failing to pay the expenses including property insurance and taxes, failed to market to attract new tenants, failed to keep the building up to code, and failed to maintain financial books and records. Instead, she paid SBC and Lyman Spitzer's attorney's rent, employee health insurance and other non-vital expenses.

40.     On or about September 2013, receiver Spitzer gave all approximately 75 tenants of the Spitzer building notice to move out by December 1, 2013 because the building was closing effectively destroying the last of the plaintiff's revenues.

41.     Lucas County treasurer obtained a foreclosure judgment for $194,343.55 against the Spitzer building while it was under the sole control of receiver Spitzer. **The Spitzer building is set for sheriff's sale November 7, 2013.** Lousville Title Agency for NW Ohio failed to pay plaintiff's taxes at the close of escrow as required by the mortgage contract. (See Exhibit F attached hereto and incorporated by this reference herein)

42.     Lucas County treasurer filed for foreclosure for tax delinquency on the Nicholas building. Plaintiffs cured the deficiency prior to foreclosure by paying $224,205.69 in taxes. This amount is disputed. $78,704.17 in taxes paid at the close of escrow according to the Port Lawrence Title and Trust Company had not in fact been paid to Lucas County Treasurer. Instead only $35,444.71 had been paid and the remaining amount had been returned to the seller. (See Exhibit G attached hereto and incorporated by this reference herein)

43.     Despite approximately 23 requests for access to the books and records pertaining to the

Spitzer and Nicholas Buildings accounts receivable and payable maintained by Defendants,

Plaintiffs still have not been given a full accounting.

## FIRST CLAIM FOR RELIEF
### (Breach of Fiduciary Duty)
### (Against all Defendants)

44.     Plaintiffs reallege and incorporate by this reference the allegations of paragraphs 1

through 43, inclusive, of this complaint.

45.     At all times herein mentioned Defendant SBC acted in a manner inconsistent with an

arms-length lender  and instead assumed complete control, management and direction of the

business of EPEG, such that Defendant SBC's relationship to EPEG became that of a fiduciary.

Defendants were involved in the day-to-day operations and management of Plaintiff' business

and in that role compelled Ergur to engage in unusual transactions given their superior

bargaining leverage as a result of the lender-borrower relationship combined with day-to-day

control over the Spitzer Building.

46.     At all times herein mentioned Defendants SA, Patrice Spitzer, Bill Thomas, Sabrina

Crabtree, and SBC acted as property managers and agents for Plaintiffs, exercising substantial

control through managing properties owned by the Plaintiff, including collection and

disbursement of rents, payment of bills, and solicitation of tenants such that the relationship

became that of a fiduciary.

47.     At all times herein mentioned Defendant Patrice Spitzer was a court appointed receiver

ordered to manage the Spitzer Building owned by plaintiffs and all business related thereto

pursuant to Ohio State Statute such that the relationship became that of a fiduciary.

- 10 -

48.     At all times herein mentioned, by virtue of the business relationship between plaintiffs and PLTTC and Louisville Title company by providing title insurance to the Spitzer and Nicholas Buildings the relationship became that of a fiduciary.

49.     Beginning in or about March 2009 Defendants commenced acting in a manner so as to cause tenants in Plaintiffs' property to look elsewhere for space and thus deprive Plaintiff of rents due them.

50.     Further, Defendants set about a course of action which Plaintiffs believe failed to accurately account for all monies and expenses of the Spitzer Building thereby causing Plaintiff to believe such properties were not producing sufficient income to pay expenses on the property.

51.     Plaintiff subsequently determined that the expenses of the Spitzer Building were overstated and the income attributable for distribution to the owners of the property was understated and that such incorrect accounting was made to convince EPEG to sell or transfer there ownership in the property.

52.     Patrice Spitzer failed to follow court orders and statutory law in that she failed maintain property insurance, pay taxes, failed to cause the property to realize its full income potential, misappropriated the rental income, failed to keep the building up to code, failed to establish sufficient accounting records, failed to file a proper accounting, failed to properly disburse receivership funds, failed to maintain and repair the building, and actively caused the tenants to move out for no legitimate reason.

53.     By exercising substantial control and providing false and fraudulent documentation for income and expense for the Property, and by preparing inaccurate or fraudulent accounting reports, including title reports, committing misconduct in the management of the properties, and

misappropriating rental funds all defendants breached their duty of care owed to Plaintiff and to each of them.

54.     That as a result of the actions of Defendants, Plaintiffs have been damaged in an amount to be proven at trial of this matter.

55.     The actions of Defendants were despicable, fraudulent and deceitful and violated the trust imposed upon them by plaintiff and by law.  As such Plaintiffs seek exemplary and punitive damages according to proof.

        Wherefore, Plaintiff requests relief stated below.

### SECOND CLAIM FOR RELIEF
### (Breach of Written Contract)
### (Against SBC and Signature Associates)

56.     Plaintiff realleges and incorporate herein by reference each and every allegation in paragraphs 1 through 55 of the Complaint as though said paragraphs were fully set forth at length herein.

57.     On or about January 7, 2009, SBC and EPEG entered into a written agreement regarding postponing the closing date of EPEG's acquisition of the Spitzer Building.

58.     On February 1, 2008 date, EPEG and Signature Associates entered into a written agreement regarding the management of the Nicholas building.

59,     EPEG has performed all conditions, covenants and obligations owed by EPEG under the agreements or have been excused from performance.

60.     SBC breached the agreements attached hereto as Exhibit A by refusing to collect and manage rents at the Spitzer Building for the benefit of EPEG.

61.     SBC breached the agreements attached hereto as Exhibit A by refusing to collect and manage rents at the Spitzer Building for the benefit of EPEG.

- 12 -

62.     As a direct and proximate result of SBC's breach of contract, SBC has been damaged in
an amount according to proof at trial.

        Wherefore, Plaintiff requests relief stated below.

### THIRD CLAIM FOR RELIEF
### (Breach of Implied Contract)
### (Against All Defendants except PLTTC and LTC)

63.     Plaintiffs reallege and incorporate herein by reference each and every allegation in
paragraphs 1 through 62 of the Complaint as though said paragraphs were fully set forth at length
herein.

64.     By virtue of SBC and defendants refusing to relinquish control over the Spitzer Building
to EPEG and inducement of EPEG to acquiesce in a "voluntary receivership," and SBC's
representation that SBC would control and manage the Spitzer Building for the mutual benefit of
EPEG and SBC, an implied property management agreement was created between Defendants
and EPEG.  Pursuant to that implied agreement, Defendants were obligated to manage the
property in the best interests of EPEG, including collecting rents and managing expenses such
that SBC could obtain revenues from ownership of the property sufficient to satisfy all
obligations of EPEG with regard to the property, plus and reasonable profit from the ownership
of the Spitzer Building.

65.     Defendants breached the implied property management agreement by diverting revenues
from the Spitzer Building to itself and others, causing EPEG financial distress and leaving EPEG
unable to service Defendants's debt against the Spitzer Building.

66.     As a direct and proximate result of SBC's breaches of implied contract, EPEG has been
damaged in an amount to be proven at trial.

        Wherefore, Plaintiff requests relief stated below.

### FOURTH CLAIM FOR RELIEF

- 13 -

**(Breach of the Covenant of Good Faith and Fair Dealing)**
**(Against all Defendants)**

67.     Plaintiffs reallege and incorporate herein by reference each and every allegation in paragraphs 1 through 66 of the Complaint as though said paragraphs were fully set forth at length herein.

68.     In all dealings with EPEG, Defendants knew that EPEG was in a vulnerable position and would rely on their representations concerning their agreements to manage the Spitzer Building, including the collection of rents, payment of expenses and solicitation and management of tenants within the Spitzer Building.

69.     At all times herein set forth, Defendants were aware that EPEG was vulnerable and that the loss of tenants, improper handling and distribution of rents and disrespect of SBC's ownership would cause EPEG to lose all of the money invested in the Spitzer Building.

70.     Defendants failed to correctly inform EPEG of the true status of the property, failed to account properly for the rents collected, misappropriated rents collected, deliberately misled tenants as to EPEG's ownership, solicited and worked with third parties named as DOE defendants herein for the purpose of obtaining title to EPEG's properties, all in violation of the covenant of good faith and fair dealing.

71.     As a direct and proximate result of the bad faith breach by Defendants of its obligations to EPEG as herein alleged, EPEG has suffered damages in an amount to be proven at trial.

        Wherefore, Plaintiff requests relief stated below.

**FIFTH CLAIM FOR RELIEF**
**(Unfair Business Practice)**
**(Against All Defendants and Does 1-10)**

72.    Plaintiff reallege and incorporate by this reference the allegations of paragraphs 1 through

71 of the complaint as though said paragraphs were fully set forth at length herein.

73.    Defendants' conduct alleged in paragraphs 1 through 72 constitute an unfair and unlawful

business practice by Defendants and each of them and constitutes unfair and deceptive business

practice by competition under provisions of California law in that Defendants representations

and conduct were meant to deceive the public as well as Plaintiff in order to allow defendants to

obtain title to the property, commissions and rents from third parties.

Wherefore, Plaintiff requests relief stated below.

### SIXTH CLAIM FOR RELIEF
### (Fraud)
### (Against Defendants and all agents of SBC and Does 5-15)

74.    Plaintiff reallege and incorporate herein by reference each and every allegation in

paragraphs 1 through 73 of the Complaint as though said paragraphs were fully set forth at length

herein.

75.    SBC, through its agents, and defendants falsely represented the following to EPEG:

   a) SBC failed to disclose serious code violations for which the Spitzer Building had
      previously cited by public agencies.
   b) SBC, from January through April 2009, would continue to own and manage the
      Spitzer Building but give EPEG the benefit of rents collected during those
      months.
   c) SBC would assume a "voluntary receivership" over the Spitzer Building and
      would properly manage that property for the mutual benefit of SBC and
      EPEG.
   d) All rent receivables were properly accounted for and used only for the benefit of
      plaintiffs.

76.    EPEG reasonably relied on the representations of Defendants, or the omission of any

disclosure of material information regarding the code violations and accounting in proceeding

- 15 -

with the acquisition of the Spitzer Building and acquiescing in SBC's continued control and management over that property.

77.    Plaintiffs reasonably relied on the representations of Defendants, or the omission of any disclosure of material information regarding the accounting and management of the Nicholas and Spitzer Buildings.

78.    As a direct and proximate result of SBC's acts of fraud, EPEG has been damaged in an amount to be proven at trial.

79.    As a proximate result of the bad faith by each of the individual defendants in committing the acts of fraud as herein alleged, plaintiff have suffered damages in an amount to be proven at trial.

        Wherefore, Plaintiff requests relief stated below.

### SEVENTH CLAIM FOR RELIEF
### (Intentional Interference with Contractual Relationship)
### (Against Defendants except PLTTC and LTC  and Does 1 through 10)

80.    Plaintiff incorporate herein by reference paragraphs 1 through 79 of this Complaint as though set forth in full herein.

81.    Defendants and each of them knew of Plaintiff agreements with existing tenants to occupy the Spitzer Building.  Despite knowing of these contracts and existing relationships, Defendants, and each of them intentionally set upon a course of action which interfered with the lease agreements and Plaintiff business relationships by failing to provide the services for which they were in substantial control of providing and by directly seeking to cause Plaintiffs tenants to negotiate and deal with the Defendants for their own mutual benefit.

82.    As a direct result of Defendants' actions and omissions, Plaintiff lost existing tenants in the buildings and the building was forced to close and remain without tenants.

- 16 -

83.     As a further direct result of Defendants' actions and omissions, and the loss of existing tenants, Plaintiff was damaged in an amount according to proof to be proven at trial but no less than $50,000.000.00.

84.     Defendants actions were undertaken with fraud, malice or oppression, or with a conscious disregard of the rights of Plaintiff, and therefore Plaintiff are entitled to an award of exemplary and punitive damages against Defendants, and each of them, in an amount according to proof.

        Wherefore, Plaintiff requests relief stated below.

        .

### EIGHTH CLAIM FOR RELIEF
### (Accounting)
### (Against SBC, Lucas County Treasurer and Does 1 through 20)

85.     Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 through 84 of the Complaint as though set forth in full herein.

86.     Defendants SA, SBC, Patrice Spitzer, Sabrina Crabtree, Bill Thomas collected rents due Plaintiffs. Defendants PLTTC and LTC managed the close of escrow of the Spitzer and Nicholas buildings and collected and disbursed funds related thereto.

87.     Defendants paid all of the money to third persons and none to Plaintiffs. Defendants PLTTC and LTC failed to disburse and collect funds properly and failed to pay taxes owed to Lucas County Treasurer at the close of escrow on the Spitzer and Nicholas Buildings. Despite being ordered to pay taxes by the court in her capacity as receiver Patrice Spitzer has failed to make the tax payments.

88.     Lucas County Treasurer has filed for foreclosure based on an amount of delinquent taxes that is inaccurate and has failed to account.

89.     Plaintiffs believed that Defendants never received credit for moneys received by

Defendants which were rightfully due Plaintiffs.

90.     The amount of money Defendants took from Plaintiff and for which Plaintiff should

receive credit is unknown to Plaintiff and cannot be determined without an accounting.

### NINTH CLAIM FOR RELIEF
### (Request for Temporary and Permanent Injunction)
### (Against defendants SBC, SA, Patrice Spitzer, Lucas County Treasurer, Lucas County Sheriffs and Does 1 through 20)

91.     Plaintiff realleges and incorporates by reference paragraphs 1 to 90, inclusive, as though

fully set forth here.

92.     As alleged above, defendants SBC, SA, Patrice Spitzer, Sabrina Crabtree, and Bill

Thomas grossly mismanaged the running of the Spitzer building by failing to pay taxes since

2009. Patrice Spitzer was court appointed receiver since 2011 and breached her duty in failing to

pay the taxes.

93.     Defendants SBC and PLTTC did not pay Lucas County Treasurer the taxes owed by

Plaintiff's in 2009 when the Spitzer building ownership transferred to plaintiffs as required by

the mortgage contract.

94.     Plaintiffs dispute the amount of taxes owed on the Spitzer building and have asked for an

accounting by Lucas County Treasurer.

95.     Lucas County Treasurer failed to properly notify plaintiffs, or serve a notice of default, as

required by law of the impending November 7, 2013 foreclosure sale.

96.     As a direct and proximate result of the conduct described above, there is a Sheriff's sale

of the Spitzer building due to this disputed tax delinquency on November 7, 2013.

- 18 -

97.     As a further direct and proximate result of the gross mismanagement, embezzlement and conversion by defendants, plaintiffs been damaged by the loss of access to the rental income from the property to pay the taxes. As a result, EPEG is entitled to injunctive relief to preserve the status quo, prevent irreparable injury, and prevent the sale (thus preventing waste) of Spitzer building, as follows:

a) For a temporary restraining order and preliminary injunction to be issued without notice to Defendants, restraining Defendants SBC, Patrice Spitzer, Lucas County Sheriff and Lucas County Treasurer, their agents, employees and representatives, from proceeding with sale of the Property by foreclosure sale set for **a November 7, 2013 Sheriff's foreclosure sale**;

b) For a temporary restraining order, preliminary injunction, and permanent injunction forbidding Lucas County Sheriff, Lucas County Treasurer, Patrice Spitzer, and SBC, and their agents or any persons acting in concert with defendants from selling transferring or encumbering the Spitzer building at a foreclosure sale;

c) For a temporary restraining order, preliminary injunction, and permanent injunction  ordering Lucas County Treasurer and Lucas County Sheriffs or their agents or any persons acting in concert with SBC, Patrice Spitzer to account for all rental income received and disbursed from the Spitzer building or any funds resulting from the the Spitzer building, be placed into safekeeping with a mutually agreed upon third party or a blocked interest bearing account, pending the completion of trial and accounting in this matter or further order of the court determining the accounting and amount of taxes actually due;

d) For the issuance of a Writ of Possession in favor of plaintiff upon the court making a final determination that the title of the Spitzer building belongs to plaintiff.

WHEREFORE plaintiffs pray for judgment against Defendants as follows as to the first through ninth causes of action:

1.     For damages in the principal amount of not less than $50,000,000.00 or as may be

established by proof at trial;

2.     That the Defendants and each of them properly account to plaintiffs for monies

received by defendants while acting as fiduciaries for Plaintiff;

3.     For income misappropriated by defendants from the Spitzer and Nicholas buildings;

4.     For damages for the cost of recovering lost income from the Spitzer and Nicholas buildings, subject to proof;

5.     For damages for lost value of rental income that should have been realized by the Nicholas and Spitzer buildings but for the misconduct of defendants;

6.     For temporary and injunctive relief as requested in the ninth claim for relief;

7.     For exemplary and punitive damages according to proof;

8.     For reasonable attorneys' fees as determined by the court;

9.     For costs of suit;

10.     For other just and proper relief.

Dated: November 4, 2013

Tracy L. Henderson Esq
236 West Portal Ave STE 413
San Francisco CA 94127
831.917.1583

- 20 -

# The Spitzer Building Company

520 MADISON AVENUE
SUITE 450
TOLEDO, OHIO 43604
(419) 255-1440

JOHN B. SPITZER
CHAIRMAN
LYMAN F. SPITZER
VICE PRESIDENT
KATHLEEN F. STACHOWIAK
OFFICE MANAGER

Est. 1896

January 7, 2009

Mr. Kerry Ergur
Ergur Private Equity Group, LLC
938 Linden Avenue
South San Francisco, CA 94083

Re:  Postponement of Closing on Sale of Spitzer Building

Dear Kerry:

This letter is to restate our agreement by telephone relating to the postponement of closing on the sale of the Spitzer Building to Ergur Private Equity Group, LLC, a Delaware limited liability company, and its subsidiary, The EPE Spitzer Building, LLC, a Delaware limited liability company (collectively, "Buyer") pursuant to the Real Estate Purchase Agreement by and between The Spitzer Building Company ("Seller") and Buyer effective October 29, 2008 (the "Purchase Agreement"). I have previously agreed on behalf of Seller to postpone the closing under the Purchase Agreement to January 5, 2009.

This letter represents our agreement on a further postponement of closing under the Purchase Agreement, as follows:

1.   You agreed that you would immediately deposit an additional $50,000 with either CB Richard Ellis/Reichle Kline or Louisville Title Company as an additional deposit under the Purchase Agreement, for a total deposit of $100,000, and instruct CB Richard Ellis/Reichle Kline and Louisville Title, as necessary, to immediately release the full $100,000 deposit to Seller. Upon closing under the Purchase Agreement, Buyer will get a full credit for this $100,000 pre-payment, without interest.

2.   Closing under the Purchase Agreement will be postponed for up to ninety (90) days from January 5, 2009, with the date of actual closing during this extension period to be determined by Buyer.

3.   We will proceed with full execution of the closing documents as of January 5, 2009, with all of the closing documents to be held by Louisville Title pending completion of

Mr. Kerry Ergur
January 7, 2009
Page 2

requirements for closing under the Purchase Agreement during the ninety (90) day extension period. Upon completion of all requirements for closing, including but not limited to your payment of the remaining cash portion of the Purchase Price, Louisville Title will proceed with conclusion of closing, with such closing to be effective as of January 5, 2009.

3.   If you are not able to complete the closing under the Purchase Agreement within the ninety (90) day extension period, we will have the right to either (i) grant an additional time for closing, or (ii) terminate the Purchase Agreement and retain the full $100,000 deposit.

4.   Seller agrees that it will continue operation of the Spitzer Building in the normal course through the date of actual closing under the Purchase Agreement, with Seller paying all costs of operation of the Spitzer Building during this period and having the right to retain all rental payments and other income from the Spitzer Building during this period. Once closing under the Purchase Agreement takes place, however, we will recalculate all of such expenditures and income back to January 5, 2009 so that Buyer will bear the full expense of operation of the Spitzer Building on and after January 5, 2009 and will have the benefit of rental receipts that Buyer would have received under the terms and conditions of the Purchase Agreement had closing taken place on January 5, 2009.

5.   We understand that Buyer's representative, Henry Park, will soon be moving to Toledo. We agree to provide working space for Henry Park in the Spitzer Building to the extent reasonably requested by him so that he can oversee and monitor operation of the Spitzer Building between the date hereof and the date of closing. We agree that we will keep Mr. Park informed of material developments relating to the Spitzer Building and decisions relating to operation of the Spitzer Building and will consult with him on such decisions. You agree, however, that the ultimate decisions on operations of the Spitzer Building until completion of closing will remain with Seller in Seller's reasonable judgment.

Please let me know if you have any questions concerning the terms of this extension agreement. If these terms are acceptable, please execute two copies of this letter where indicated and send both copies to Louisville Title with your additional $50,000 deposit. Louisville Title will keep one executed copy for its records and provide one executed copy to me.

Very truly yours,



Lyman F. Spitzer
Vice President

LFS/dah

Mr. Koray Ergur
January 7, 2009
Page 3

## ACCEPTANCE OF BUYER

Buyer hereby accepts and agrees to the foregoing terms and conditions for the extension of closing under the Purchase Agreement and hereby instructs CB Richard Ellis/Reichle Kline and Louisville Title Company to proceed with immediate release of the $100,000 deposit to the Spitzer Building Company.

**Ergur Private Equity Group, LLC**
**And**
**The EPE Spitzer Building, LLC**

By: _____
Koray Ergur, Manager

Date: 1/8/08

OMB Approval No. 2502-0265

| A. Settlement Statement | B. Type of Loan |
|---|---|

| 1-6. Loan Type Conv: Unins |
|---|
| 6. File Number 1380558 |
| 7. Loan Number |
| 8. Mortgage Insurance Case Number |

## The Port Lawrence Title and Trust Company
### Final Statement

C. Note: This is a [illegible] ...

D. Name of Borrower: Ergur Private Equity Group, LLC
608 Madison Avenue, 319, 321 and 323 North Huron Street, Toledo, OH 43604

E. Name of Seller: Madison Assets LLC

F. Name of Lender: Gary D. Catron

G. Property Location: 608 Madison Avenue, 319, 321 and 323 North Huron Street, Toledo, OH 43604

H. Settlement Agent: The Port Lawrence Title and Trust Company
Address: 616 Madison Avenue, Toledo, OH 43604

Place of Settlement Address: 616 Madison Avenue, Toledo, OH 43604

Settlement Date: 01/09/2008

Print Date: 01/08/2008 3:50 PM

Disbursement Date: 01/09/2008

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| 100. Gross Amount Due From Borrower | | 400. Gross Amount Due To Seller | |
| [illegible] | [illegible] | 401. [illegible] | 313,600.00 |
| [illegible] | | 402. [illegible] | |
| [illegible] | [illegible] | 403. [illegible] | |
| [illegible] | | 404. | |
| [illegible] | | 405. | |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| [illegible] | | 406. City/town taxes | |
| [illegible] | | 407. County taxes | |
| [illegible] | | 408. Assessments | |
| 108. [illegible] 1/1/08 to 1/31/08 at 125.00 | [illegible] | 409. [illegible] | [illegible] |
| 109. | | 410. | |
| 110. | | 411. | |
| 111. | | 412. | |
| 112. | | 413. | |
| 113. | | 414. | |
| 114. | | 415. | |
| 120. Gross Amount Due From Borrower | 1,820,839.56 | 420. Gross Amount Due To Seller | 316,258.06 |
| 200. Amounts Paid By Or In Behalf of Borrower | | 500. Reductions In Amount Due to Seller | |
| 201. [illegible] or earnest money | | 501. [illegible] | |
| 202. Principal amount of new loan(s) | 1,503,000.00 | 502. Settlement charges (line 1400) | [illegible] |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. Paid to [illegible] | [illegible] | 504. Payoff of mortgage loan | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. 1st 1/2 2007 taxes 412-70701 to Lucas County Treasurer | 81,111.16 |
| 207. | | 507. [illegible] 412-168 to Lucas County Treasurer | [illegible] |
| 208. | | 508. 1st 1/2 2007 taxes 412-16804 to Lucas County Treasurer | [illegible] |
| 209. | | 509. 1st 1/2 2007 taxes 412-16807 to Lucas County Treasurer | [illegible] |
| Adjustments for items unpaid by seller | | Adjustments for items unpaid by seller | |
| 210. City/town taxes | | 510. City/town taxes | |
| 211. County taxes 1/1/08 to 1/31/08 at 125.00 | 7,779.15 | 511. County taxes 1/1/08 to 1/31/08 at 125.00 | [illegible] |
| 212. Assessments | | 512. Assessments | |
| 213. [illegible] | 75,976.15 | 513. Read 1/4 [illegible] | 75,976.15 |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| 220. Total Paid By/For Borrower | 1,897,349.18 | 520. Total Reduction Amount Due Seller | 207,119.10 |
| 300. Cash At Settlement From/To Borrower | | 600. Cash At Settlement To/From Seller | |
| 301. Gross amount due from Borrower (line 120) | 1,820,839.56 | 601. Gross amount due to Seller (line 420) | 316,258.06 |
| 302. Less amounts paid by/for Borrower (line 220) | 1,897,349.18 | 602. Less reductions in amounts due to Seller (line 520) | 207,119.10 |
| 303. Cash ( Free) (X To) Borrower | 76,509.60 | 603. Cash (X To) ( From) Seller | 109,138.98 |

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

Settlement Agent _____   Date _____

(See Supplement Page 2 of Ser. ...)







**SIGNATURE** ASSOCIATES
THE TEAM  No Signature. No Results.
**ADVISORY SERVICES**

### MANAGEMENT AGREEMENT - Office

**THIS AGREEMENT**, made and entered into as of this _1st_ day of _February_ _____, 2008, by and between **Ergur Real Estate Group, Inc., as agent ("Agent") for Ergur Private Equity Group, LLC the fee simple owner ("Owner") of record of the Property (herein defined)**, whose address is 938 Linden Avenue, South San Francisco, CA 94080 (hereinafter **"OWNER"**), and **SIGNATURE ASSOCIATES, INC.**, (hereinafter **"SUB-AGENT"**), whose address is Four SeaGate, Suite 608, Toledo, Ohio, 43604.

### WITNESSETH:

The following is a recital of the facts underlying this Agreement:

A.    Owner hereby represents and warrants to Sub-Agent that Owner owns the multi-story office building located at **606 Madison, Toledo, Ohio, 43604** (hereinafter **"PROPERTY"**).

B.    Owner and Agent desires to employ Sub-Agent to manage and operate the Property, and Sub-Agent desire to render such management services to Owner, all upon the terms and conditions hereinafter set forth.

**NOW, THEREFORE**, in consideration of mutual covenants and agreements herein contained, the parties hereto hereby agree as follows:

1) **ENGAGEMENT OF SUB-SUB-AGENT**.  Owner and Agent hereby employ Sub-Agent, and Sub-Agent hereby agrees to serve as the sole and exclusive management and leasing Sub-Agent for Owner in connection with the Property for the period of time and upon the terms and conditions hereinafter set forth.

2) **COLLECTIONS.**  Sub-Agent is hereby authorized to collect for the account of Owner all rentals, reimbursable utility charges, common area charges, insurance charges, real estate and personal property tax and assessment charges and any and all other charges and/or income accruing to Owner from the Property during the term of this Agreement.   Sub-Agent shall, on behalf of and at Owner's expense, utilize such collection procedures as it deems appropriate in order to collect any past-due rentals or other charges or income from the Property; provided, however, that Sub-Agent shall not institute, prosecute and/or settle any judicial proceedings with respect to such collection activities without first notifying Owner. All bills for services rendered for collection by outside vendors will be itemized unless a contingency fee arrangement for the vendor is agreed to by Sub-Agent and Owner.  Sub-Agent will keep Owner advised, from time to time, of Sub-Agent's collection activities hereunder. Sub-Agent will cooperate with Owner in any proceedings instituted by Owner to recover monies due Owner with respect to the Property or to recover possession of any portion of the Property, all such proceedings to be at Owner's expense.

DETROIT 2965276.2



**SIGNATURE** ASSOCIATES
THE TEAM   No Signature. No Results.
**A D V I S O R Y   S E R V I C E S**

Sub-Agent will be responsible for the billing activities with respect to the Property.

3) **MAINTENANCE, REPAIRS AND ALTERATIONS**

Sub-Agent shall arrange for the maintenance, repair and alteration of buildings and improvements comprising the Property in order to keep the same in a safe, sound, attractive and rentable condition, all such maintenance, repairs and alterations to be at the sole cost and expense of Owner. In addition, Sub-Agent shall make periodic inspections in order to maintain and improve the architectural and physical integrity of the Property and shall provide Owner with evaluations and recommendations with regard thereto. Notwithstanding the foregoing, Sub-Agent shall not, without the prior written approval of Owner, make nor incur expenditures for the maintenance, repair or alteration of the Property in excess of Two Thousand ($2,000.00) Dollars in the case of any one item over the current budget limitation therefore set forth in the current budget approved by Owner, and for which at least two competitive bids will be secured, where practicable, except for (i) expenditures reimbursable to Owner by tenants in the Property and (ii) expenditures for emergency repairs to the Property which, in Sub-Agent's opinion, are required to be made for the preservation and safety of the Property or to avoid the suspension of any service to or of the Property or to avoid danger to life or property at the Property. Sub-Agent agrees to confer as soon as reasonably possible with Owner regarding any such emergency expenditure.

4) **UTILITY SERVICES.** Sub-Agent shall arrange for such contracts in the name of Owner for electricity, gas, fuel, water, telephone, rubbish removal and other like utility services for the Property as Sub-Agent shall deem advisable.

5) **INSURANCE.** Owner shall, throughout the term of this Agreement, arrange, through Sub-Agent's services and facilities, at Owner's option, for the placement, maintenance and payment of all forms of insurance required by law or, in Owner's or Sub-Agent's judgment, needed to adequately protect Owner and Sub-Agent (both of whom shall be named as insureds thereunder) with respect to the Property, however, in an amount of at least One Million ($1,000,000) Dollars single limit per occurrence coverage, provided that in no event shall Sub-Agent be liable for the placement, maintenance and payment of any such insurance coverage. Sub-Agent will attempt to obtain any such insurance at competitive rates and the insurance coverage provided shall be at least that which is required by any mortgagee of the Property. The insurance to be obtained hereunder by Owner shall, without limitation, include worker's compensation insurance, public liability and property damage insurance, boiler and machinery insurance (if applicable), fire and extended coverage insurance and burglary and theft insurance, broad form contractual indemnity coverage, to the extent that same are necessary and available. Copies of all such insurance

DETROIT 2965276.2



policies shall be furnished to Owner, Agent and Sub-Agent, and Sub-Agent shall, from time to time but at least once annually, review such insurance coverage and make its recommendations, if any, concerning the same to Owner. Sub-Agent shall have custody of any original policies and/or certificates of insurance furnished by tenants in the Property. Sub-Agent shall cooperate with Owner with respect to any claim, which may arise under any such insurance policies, provided that the prosecution of any such claim shall be at the cost and expense of Owner.

6) **TAXES AND REIMBURSABLES.**

   a) Sub-Agent shall review annually the tax assessments upon the Property and recommend to Owner such action as Sub-Agent may deem proper in connection therewith. Sub-Agent will cooperate with Owner in any proceedings instituted by Owner contesting or appealing the assessed valuation of any of the real or personal property included with the Property. Sub-Agent shall promptly advise Owner of all matters coming to its attention pertaining to the real and personal property taxes and assessments at the Property. All real and personal property taxes and assessments respecting the property included with the Property shall be paid by Sub-Agent out of funds generated by the Property which are collected or received by Sub-Agent pursuant to Paragraph 2 hereof and are available for the payment of such taxes, it being understood that, in the event the funds available for the payment of such taxes are not sufficient to cover the same, the Owner shall pay such deficiency, and Sub-Agent shall, in no event, be responsible for the payment of same.

   b) Sub-Agent shall review each of the Leases of the Owner for the site. With respect to each tenant that is responsible to reimburse Owner for common area maintenance, insurance and taxes, Sub-Agent shall review the budgets for each item annually and notify tenants of increases of changes in a timely fashion and in accordance with the terms of the respective leases. When applicable, Sub-Agent shall bill all excess expenses in accordance with the terms of the respective leases.

7) **BANK ACCOUNTS.**

   a) All monies collected or received by Sub-Agent with respect to the Property shall promptly be deposited into a separate bank account, which account shall be maintained at and used solely for the operation of the Property, and such monies shall not be commingled with Sub-Agent's own funds. Checks may be drawn on such account only for purposes authorized under this Agreement, and under no circumstances shall checks be drawn to the order or benefit of Sub-Agent, except for the payment of its compensation hereunder or the refund or reimbursement of amounts, if any, advanced by Sub-Agent for the benefit of the Owner pursuant to this Agreement. Owner

DETROIT.2965276.2



**SIGNATURE** ASSOCIATES
**THE TEAM**   No Signature. No Results.
**ADVISORY SERVICES**

shall establish and maintain a working capital account with sufficient funds for the timely payment of all costs and expenses (including Sub-Agent's compensation) of the Property if the monies collected or received by Sub-Agent with respect to the Property are insufficient to pay the same when due. All personnel of Sub-Agent who handle or are responsible for the handling of Owner's funds, shall, upon request of Owner and at Owner's expense, be bonded in favor of Owner by a fidelity bond in such form and amount and issued by such surety as shall be acceptable to Owner.

b) Upon termination as provided in paragraph 16, Sub-Agent shall within 72 hours (3 business days) turn over all funds belonging to Owner being all funds in the Owner's accounts less only those sums necessary to cover outstanding checks and management fees through the date of termination.

8) **REPORTS, BUDGETS AND STATEMENTS.** Throughout the continuation of this Agreement, Sub-Agent shall furnish Owner with the following statements concerning the operation of the Property at the time and in the manner specified:

a) Within thirty (30) days after the end of each calendar month, a financial statement accurately reflecting the financial activities of the Property, including the monthly bank account statement, a profit and loss statement, comparing the results of operations to the annual and monthly operating and maintenance budget, as referred to hereunder, and a statement of all receipts and disbursements, on a cash or accrual basis as may be required by Owner.

b) Not less than thirty (30) days prior to the beginning of each calendar year during the term of this Agreement, an annual operating budget, maintenance and capital budgets and cash flow forecast with respect to the Property for the succeeding twelve (12) month calendar period.

c) Sub-Agent shall cooperate with Owner's accountant or auditor in the preparation of audited financial statements, and federal, state and local tax returns of the Property, within the reasonable duties of Sub-Agent in its capacity as Sub-Agent for Owner, without additional compensation to Sub-Agent. The cost and expense of such statement, preparation or filing is the obligation of Owner.

d) Sub-Agent shall remit to Owner, by the 15th of the month, such portion of the cash balance in the bank account of the Property not required for operation of the Property as Owner may direct in writing from time to time. The books and records relating to the Property, all of which shall be deemed to be the property of Owner, shall be kept and maintained by Sub-Agent at its principal office in Southfield, Michigan, or such other location as Sub-Agent may from time to time designate in writing. Owner, or its duly

DETROIT.2965276.2



**SIGNATURE** ASSOCIATES
**THE TEAM** No Signature. No Results.
**ADVISORY SERVICES**

authorized Agent, shall have the right to examine such books and records at any time during normal business hours upon at least two (2) days' prior written notice.

9) **MORTGAGE PAYMENTS.** Sub-Agent shall, for and on behalf of Owner, make the mortgage, or of any other instrument reflecting a debt on the real property of the Property, payments required to be made with respect to the Property out of monies collected or received by Sub-Agent pursuant to Paragraph 2 hereof, providing such monies are sufficient to cover any such payment, or paid directly by Owner.

10) **SUB-AGENT'S COMPENSATION.**

a) **Management Fee.** As compensation for the performance of all the services provided by Sub-Agent to Owner under this Agreement, Sub-Agent is hereby authorized to withhold from gross receipts received or collected from the operation of the Property, a management fee on or before the fifth (5th) day of each month during which such services are performed. Such fee will be equal to the greater of (i) **Five Thousand Two Hundred and Seventy-five ($5,275.00)** (minimum monthly fee) or, (ii) **Two (2%)** of the gross receipts received or collected by Sub-Agent on behalf of Owner and will be given priority over other expenses of the Property.

Gross Receipts shall include: payments received from Tenants for rent, including payments made in consideration of the cancellation, surrender or modification of any lease or made by reason of any default thereunder, or the application of security deposits; taxes, including real estate taxes, general or special assessments and taxes on rental income (excluding the Owner's federal income taxes) not paid directly by tenants to the taxing authorities. Gross Receipts shall also include operation or common area expenses or other such items, including all payments or reimbursements by tenants for operating, maintenance, upkeep and repair expenses for the buildings, other improvements and grounds of the Property, landscaping and exterior painting of the buildings and resurfacing of paved areas; fire, extended coverage and casualty insurance premiums and premiums for any other kind of insurance, including rent loss insurance; and water, sewer, fuel and other utility services not separately metered and directly payable by tenants of the Property.

Gross Receipts. Gross receipts shall not include payments received from tenants for: the repair of any damage to the Property or any other tenant reimbursement to Owner for costs or damages for which the tenant is responsible; management services in addition to the day-to-day operation and management of the Property; any security or other deposits unless or until applied. The management fee shall not apply to any insurance reimbursement or proceeds that are received on behalf of the Owners.



**SIGNATURE** ASSOCIATES
THE TEAM No Signature. No Results.
**ADVISORY SERVICES**

b) **Leasing.** Provided for under separate agreement.

c) **Construction Management.** Owner may request Sub-Agent in writing to act as a construction manager or owner's representative for renovations, improvements or additions to the Property. In each event, Owner will pay Sub-Agent an additional fee for such construction management services according to the schedule below.

Construction management fee schedule:
  0% fee for contracts up to $50,000
  4% fee for contracts between $50,001 and $250,000
  3.5% fee for contracts between $250,001 and $500,000
  3% fee for contracts over $500,001
Any construction management fee is payable by Owner to Sub-Agent within thirty (30) days of substantial completion of the construction work.

d) **Additional Services.** Sub-Agent can provide the following additional services as requested by Owner. Charges for these additional services are payable monthly at standard billing rates as follows:

Maintenance Technician                 $ 75.00 the first hour and
                                       $ 50.00 each additional hour

These rates will increase 3½% per year.

11) **OWNER'S ADDITIONAL EXPENSES - REIMBURSEMENTS.** In addition to the compensation to be paid to Sub-Agent pursuant to Paragraph 10 hereof with respect to the Property, Owner shall pay all costs and expenses of operating the Property, which are customarily paid by an owner of a similar property, including, but not limited to, the following:

a) The compensation (including so-called fringe benefits, medical and health insurance, pension plans, social security taxes, worker's compensation insurance, profit sharing and the like) paid to any and all employees of the Owner, excluding Sub-Agent's manager assigned to the Property.

b) The costs and expenses necessary to maintain and operate the Property in accordance with the terms and provisions of this Agreement including the costs and expenses incurred in maintaining and operating Sub-Agent's office, if any, at the Property;

c) The costs and expenses of any audit of the books and records of Sub-Agent relating to the Property, whether such audit be in connection with the preparation of appropriate tax returns for the Property or otherwise;



SIGNATURE ASSOCIATES
THE TEAM No Signature. No Results.
ADVISORY SERVICES

    d) The costs and expenses of Sub-Agent with respect to travel and business expenses incurred in connection with its management of the Property, only as approved by Owner in writing and in advance in each instance;

    e) All fees and payments made to third parties, such as, but not limited to, legal fees, consultants' and brokerage fees if outside the normal course of business; provided the engagement by Sub-Agent of all third parties, same shall be approved by Owner in writing in advance, etc.;

    f) Postage, mailing and messenger/courier charges; electronic transfer and other bank account charges or fees incurred by Sub-Agent.

12) **HOLD HARMLESS.** Owner and Agent agree to indemnify and hold Sub-Agent, its officers, directors, stockholders, and employees, harmless from any and all suits, actions at law, claims and liability of any kind and nature whatsoever ("Claims"), arising out of and in connection with the use, management, and operation of the Property, excepting therefrom any Claims arising from or related to the willful misconduct or gross negligence of Sub-Agent, and including, by way of example and not of limitation, any alleged violation of any local, state or Federal public, health, safety and environmental laws, regulations, building codes, employment practices and violation of any laws against discrimination based on race, sex, creed, color, religion, marital status, age, national origin, or mental or physical handicap unless Sub-Agent is finally adjudged to have personally, and not in an authorized representative capacity, to have violated any such law, regulation, building code or employment practice. Owner shall assume the legal defense of any Claims and shall pay all reasonable legal fees associated with Claims and other costs related thereto.

Sub-Agent agrees to defend, indemnify and hold Owner and Ergur Private Equity Group, LLC, and their officers, directors, stockholders, members, mangers and employees, harmless from any and all suits, actions at law, claims and liability of any kind and nature whatsoever ("Sub-Agent Claims"), arising out of and in connection with the use, management, and operation of the Property by Sub-Agent, or its employees, contractors or agent, excepting therefrom any Sub-Agent Claims arising from or related to the willful misconduct or negligence of Owner or Agent.

13) **SUB-AGENT MANAGER.** Sub-Agent, at its sole expense, shall provide a competent manager without being dedicated to the Property with respect to the performance of Sub-Agent's duties and obligations under this Agreement. The Sub-Agent manager shall devote such time as is required for the management and operation of the Property according to this Agreement and as determined by Sub-Agent in its reasonable discretion, unless specifically agreed to by both parties hereto. If required and with Owner approval, Sub-Agent shall be responsible for the hiring, training and supervision of sufficient, efficient and competent employees, in addition to the manager, to perform Sub-Agent's

DETROIT.2965276.2



**SIGNATURE** ASSOCIATES
**THE TEAM** No Signature. No Results.
**ADVISORY SERVICES**

duties and obligations under this Agreement, all such personnel to be employed by Sub-Agent and the cost of which shall be the obligation of the Owner and Sub-Agent shall be reimbursed for all such expenditures. The manager and employees of Sub-Agent at the Property shall be deemed employees of the Sub-Agent and not employees of the Owner, notwithstanding Owner's obligation to reimburse Sub-Agent pursuant to Paragraph 12(A) hereof. No manager shall be appointed without the consent of Owner.

14) **TERM.** This Agreement shall be effective as of January 10, 2008, and shall continue through January 9, 2009 unless sooner terminated as hereinafter provided, and thereafter, on a year-to-year basis unless either party shall give notice to the other within sixty (60) days prior to the end of the then current term of its intention to terminate and cancel this Agreement.

15) **TERMINATION.** Anything herein contained to the contrary notwithstanding, this Agreement may be terminated:

a) By either party hereto with sixty (60) days written notice, or.

b) By either party hereto, in the event Owner makes a bona fide sale of its interest in the Property to be effective upon the date of consummation of sale; or,

c) In the event either party hereto shall default in the performance or observance of any term, condition or covenant contained in this Agreement, and such default shall continue for a period of ten (10) days after written notice thereof shall have been given to the defaulting party specifying such default and requesting that the same be remedied, unless such default cannot be remedied within such ten (10) day period, in which event the party in default shall be deemed to be in compliance with this provision if it shall, in good faith, have commenced to remedy such default within such ten (10) day period and, thereafter, shall have prosecuted to completion with diligence and continuity the remedying thereof and shall have remedied such default within a reasonable time; then, and in any event, the non-defaulting party may, at any time thereafter, declare by written notice to the defaulting party that this Agreement shall be terminated on the date specified in such notice. Thereupon, on such date, if such events of default shall be continuing, this Agreement shall terminate. Upon such termination, Sub-Agent shall forthwith surrender and delivery to Owner any space in the Property occupied by Sub-Agent and all monies due Owner under this Agreement received after termination; deliver to Owner such contracts, documents, papers and records pertaining to this Agreement as Owner may request said items being deemed to be the property of Owner; and furnish all such information and take all such action as Owner shall require in order to effectuate an orderly and systematic termination of Sub-Agent's duties and activities hereunder; or.



**SIGNATURE** ASSOCIATES
**THE TEAM** No Signature. No Results.
**ADVISORY SERVICES**

d) Upon written notice thereof by Owner to Sub-Agent, if Sub-Agent shall file a voluntary petition in bankruptcy, or shall be adjudicated a bankrupt or an insolvent, or shall file any petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief for itself under the present or future applicable statute or law relative to bankruptcy, insolvency, or other relief for debtors, or shall seek or consent to or acquiesce in the appointment of any trustee, receiver, conservator, or liquidator of Sub-Agent, or of all or any substantial part of its properties (the term "acquiesce," as used herein, being deemed to include, but not limited to, the failure to file a petition or motion to vacate or discharge any order, judgment or decree providing for such appointment within the time specified by law); or,

e) Upon written notice thereof by Owner to Sub-Agent, if a court of competent jurisdiction shall enter an order, judgment or decree approving a petition filed against Sub-Agent seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the present or future applicable statue or law relating to bankruptcy, insolvency or other relief for debtors, and Sub-Agent shall acquiesce (as hereinabove defined) in the entry of such order, judgment or decree, or the same shall remain unvacated and unstayed for any aggregate of ninety (90) days from the date of entry thereof, or any trustee, receiver, conservator or liquidator of Sub-Agent or of all or any substantial part of its property shall be appointed without the consent of or with the acquiescence of Sub-Agent and such appointment shall remain unvacated and unstayed for an aggregate of ninety (90) days; or,

f) Upon written notice thereof by Owner to Sub-Agent, if Sub-Agent shall admit in writing its inability to pay its debts as they mature; or if Sub-Agent shall give notice to any governmental body of insolvency or pending insolvency, or suspension or pending suspension of operations; or if Sub-Agent shall make an assignment for the benefit of creditors or take any other similar action for the protection or benefit of creditors.

16) **RESTRICTION AGAINST EMPLOYMENT.** Owner hereby agrees during the term of this Agreement and for a period of one (1) year after the expiration or termination of this Agreement not to employ any of Sub-Agent's personnel in any capacity whatsoever without Sub-Agent's express written consent.

17) **AUTHORIZATIONS, CONSENT AND APPROVAL.** Where the consent or approval of Owner is required hereunder, Sub-Agent is authorized to act upon receipt of the consent or approval of any one of the following persons: _____, its _____ or such others as may be designated by Owner from time to time.

DETROIT.2965276.2



**SIGNATURE** ASSOCIATES
**THE TEAM**  No Signature. No Results.
**A D V I S O R Y   S E R V I C E S**

18) **NOTICES.** Any notice under this Agreement shall be in writing and delivered personally or sent by certified mail, return receipt requested, facsimile, or overnight mail with proof of delivery to the respective addresses of the parties hereto listed below:

   a)  If to Owner, to:    Koray Ergur
                            Ergur Real Estate Group
                            938 Linden Ave
                            PO Box 1027
                            San Francisco, CA 94083
                            650-873-0120
                            650-873-0150

   b)  If to Sub-Agent, to:    Signature Associates, Inc.
                               One Towne Square
                               12th Floor
                               Southfield, Michigan 48076
           Attn:        John Salsberry
          Phone:      248-948-9000
            Fax:        248-359-0605

19) **DIRECTIONS.** It is acknowledged and agreed that Sub-Agent will be taking direction from either Owner or Agent under this Agreement, and Sub-Agent shall have the right to rely on instructions from either Owner or Agent. If Sub-Agent shall receive instructions from either Owner or Agent, Sub-Agent shall not be obligated to determine whether or not such instructions are proper or accurate. Sub-Agent shall have no liability or obligation to investigate the propriety or accuracy of such inconsistent directions given by Owner and Agent. In effect, Owner and Agent shall be treated as one party under the terms of this Agreement.

20) **SUB-AGENT LIABILITY.** Sub-Agent shall not be liable for any error in judgment nor for any mistake of fact or law, nor for anything, which it may do or refrain from doing hereafter, except in cases of willful misconduct or gross negligence.

21) **BINDING EFFECT.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns, but, except for assignment by Sub-Agent to its wholly-owned subsidiary or an affiliated company, shall not be assignable by either party without the prior written authorization one to the other. This Agreement is governed by Ohio law. Each party consents to venue in the Lucas County Court of Common Pleas for any dispute arising under this Agreement.

DETROIT 2965276.2



**SIGNATURE** ASSOCIATES
THE TEAM   No Signature. No Results.
**ADVISORY SERVICES**

The parties hereto have executed this Agreement as of the day and year first above written by their respective duly authorized officers.

**OWNER:**
**ERGUR REAL PROPERTY GROUP, INC.**

By: _Koray Ergur_

Its: _President_

Date: _2/1/2008_

**SUB-AGENT:**
**SIGNATURE ASSOCIATES, INC.**

By: _John Salsberry_

Its: _Managing Director_

Date: _2|1|08_

DETROIT.2965276.2

**E-JOURNALIZED**

JAN 2 5 2011

SCANNED

File No. 12110/84

FILED
LUCAS COUNTY

2011 JAN 24 P 3 33

COMMON PLEAS COURT
BERNIE QUILTER
CLERK OF COURTS

IN THE COURT OF COMMON PLEAS

LUCAS COUNTY, OHIO

The Spitzer Building Company, an Ohio
Corporation

Plaintiff,

vs.

Ergue Private Equity Group, LLC, a Delaware
Series LLC, et al.,

Defendants.

Case NO.: _____

Judge _____

ASSIGNED TO JUDGE JENTEN

Order Appointing Patrice Spitzer as
Receiver Ex Parte

CI2011013 57

This matter came on to be considered upon the Motion of Plaintiff **The Spitzer Building Company, an Ohio Corporation** ("Plaintiff") for an Order appointing a receiver (the "Motion") over the Property (as such term is defined in the Complaint). Based on the circumstances set forth in the Motion and the exhibits thereto, and pursuant to Ohio Revised Code Chapter 2735, for good cause shown, the Court now finds as follows:

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED:

1.  **Patrice Spitzer** (the "Receiver") is hereby appointed Receiver (the "Receiver") of the Property, as of the date of this order (the "Receivership Date"), and the Receiver shall have all authority and power of a receiver under Ohio law and as ordered by this Court.

2.  The Receiver shall take immediate possession, control, management, operation and charge of the Property. Pursuant to Ohio Rev. Code Section 2735.04 and under the control of this Court, the Receiver shall have all such authority and power of a receiver under Ohio law, including the following powers and duties:

    a.  collect the rents, profits and other income from the Property;

LAW OFFICE OF PATRICK D. HENDERSHOTT, LLC

File No. 12110/84

b.  manage and maintain the Property and make any necessary or appropriate repairs;

c.  maintain adequate security and protection for the Property;

d.  continue with the operation of the Property (including, without limitation, entering into or terminating tenant leases and/or occupancies and contracts providing from the management, operation, maintenance, security, and the provision of goods and services to the Property) and to otherwise preserve, manage, maintain and protect said Property;

e.  make capital or other improvements to the Property which the receiver deems necessary or prudent in order to attract new tenants or retain existing tenants;

f.  make payments on any debt secured by a mortgage on the Property;

g.  respond to and defend against actions, claims or lawsuits filed in respect of the Property;

h.  bring actions, claims or lawsuits on behalf of or in relation to the Property or the tenants thereof;

i.  apply the rents and profits and other income of the Property to any of the foregoing and for any other expenses of operating the Property including without limitation, management fees, taxes, utilities, insurance premiums, and existing service contracts on the Property, and leasing commission;

j.  sell the property subject to the due process of the lien holders;

with the remainder of such rents and profits to be held by the Receiver pending further order of this Court;

3.  The Receiver is authorized to (4) utilize **Assistant Building Manager David Lowry**, or other persons or entities, without further court order, (5) to manage the Property and

LAW OFFICE OF PATRICK D. HENDERSHOTT, LLC

File No. 12110/84

Page 3 of 5
ANNEX

to pay management fees; (ii) an exclusive leasing agent to procure tenants for the Property; and (iii) to pay commissions. Assistant Building Manager David Lowry and such persons or entities as the Receiver shall utilize shall be acting under the authority and appointment of the Court and the Receiver.

4. The Receiver is authorized to retain legal counsel to represent the Receiver generally in this Receivership including, without limitation, in dealing with tenants, in report to and appearing before this Court, and as necessary in dealing with the parties to the action.

5. The Receiver shall have the exclusive right to negotiate with any potential buyer of the Property and Defendants shall not be permitted to negotiate or discuss possible sale of the Property with anyone except through the Receiver or as permitted by the Receiver or the Court; provided, however, that the Receiver shall not be permitted to sell the Property except as confirmed by Court order.

6. All tenants or other persons, now or hereafter in possession of all or any part of the Property, shall (and are hereby order to) pay to the Receiver or the Receiver's agent, all rents now due and unpaid and all rents as they become due.

7. Defendants shall cooperate with receiver in the transition of the operation of the property. Defendants shall immediately pay the Receiver or the Receiver's agent all rents and revenues of the Property for the period commencing as of the Receivership Date upon receiving them from any source, including without limitation, all rents and revenue payable for the present month which Defendants have received or shall receive. Any and all obligations incurred by Defendants and/or their agents prior to the appointment of the receiver shall remain their responsibility; Defendants shall also turn over to receiver all of the personal property acquired by them or used by them in connection with the property including, but not limited to, all property which is subject to Plaintiff's Mortgage or security interests.

File No. 12110/84

Page 4 of 5
ANNEX

proceedings necessary to recover rent and is hereby authorized to receive or to recover possession of all or any part of the Property.

8. The Receiver shall have the power to institute and prosecute all actions

9. The Receiver, and her agents, including her counsel and any accountants that are appointed by the Court, shall be entitled to reasonable compensation for services rendered and reimbursement for expenses (a) related to the Receiver's duties, rights, and obligations under this Order or any future orders of the Court and applicable law; (b) related to the administration, management, protection or liquidation of the Property; or (c) related to the defense or prosecution of any claim or suit brought against the Receiver or by the Receiver against any person or entity. Such compensation of the Receiver and her agents, her counsel and her accountants shall be reviewed by the Court and awarded from the Receivership estate and/or pursuant to Ohio Revised Code Section 2333.27. However, Patrice Spitzer has agreed to waive her fees.

10. With respect to seeking compensation and reimbursements of costs and expenses for the Receiver, her agents or legal counsel, the Receiver shall describe the such compensation, expenses and reimbursements in applications which will be submitted to the Court for approval prior to payment.

11. Any and all persons including specifically, but not limited to, the Defendants, in possession of or having control over any documents, leases or accounting records relating to the operation of the Property shall deliver them to the Receiver forthwith, and shall account for and pay over to the Receiver any funds in the person's possession, either in the form of rents, profits, or security deposits. This includes, but is not limited to, all leases, rent rolls, names of tenants, copies of service contracts and utility bills, and any and all current or past operating statements of the Property and any other documents maintained by the owner or its agent(s) pertinent to the operation and management of the Property. The receiver is authorized to transfer funds held in all current accounts related to the property to a separate account. The receiver shall

File No. 12110/84

Page 5 of 6

immediately open an account with a depository financial institution to comply with all of receiver's duties as set forth in this Order.

12. The Receiver shall be named as an additional insured party on any existing liability and property damage insurance policies on the Property and if needed, is authorized to obtain customary insurance coverage for the Property, as a property expense.

13. In carrying out the duties as set forth herein, the Receiver is entitled to act in the exercise of her own sound business judgment as she deems appropriate within her sole discretion. The Receiver shall not be liable for any action taken or not taken by her in good faith and shall not be liable for any mistake of fact or error of judgment or for any acts or omissions of any kind unless caused by the willful misconduct or gross negligence on the part of the Receiver.

14. The Receiver may apply to the Court by motion and upon notice to all parties for further or other authority as may be necessary in her performance of her duties.

15. The Receiver shall serve without bond.

16. The terms of this Order shall continue in full force and effect unless and until

IT IS SO ORDERED.

Dated: _____   _____
JUDGE

TO THE CLERK:
Pursuant to Civil Rule 58(B), the Clerk is directed to serve upon the parties a notice of the filing of this Order and of the date of entry upon the journal.

SUBMITTED BY:

Patrick D. Hendershott (0062447)
Enng D. Dacey (0076715)
LAW OFFICE OF PATRICK D. HENDERSHOTT, LLC
Attorneys for Plaintiff

LAW OFFICE OF PATRICK D. HENDERSHOTT, LLC

**THE SPITZER BUILDING COMPANY**
**INCOME STATEMENT**
**Final Report 2008**

| | | Year 01/01/06-12/31/06 ACTUAL $ | | Year 01/01/07-12/31/07 ACTUAL $ | | Year 01/01/08-12/31/08 ACTUAL $ |
|---|---|---|---|---|---|---|
| **OPERATING REVENUE:** | | | | | | |
| | | | | | | |
| Rents Billed | $ | 699,970.92 | $ | 728,008.84 | $ | 700,034.91 |
| Percentage & Cash Rents | $ | 40.00 | $ | 30.00 | $ | 185.00 |
| Electric Billed | $ | 110,877.29 | $ | 104,855.24 | $ | 89,982.07 |
| Delinquent Rent Charges | $ | (354.08) | $ | 962.22 | $ | 561.28 |
| Sales Discounts | $ | (1,110.14) | $ | (10,046.19) | $ | (14,249.73) |
| | | | | | | |
| TOTAL OPERATING REVENUE: | $ | 809,423.99 | $ | 823,810.11 | $ | 776,513.53 |
| | | | | | | |
| **EMPLOYEE EXPENSES:** | | | | | | |
| | | | | | | |
| Salaries - Office Employees | $ | 44,899.45 | $ | 48,002.50 | $ | 39,545.00 |
| Wages - Mechanics | $ | 29,225.00 | $ | 28,644.00 | $ | 29,989.00 |
| Wages - Maintenance | $ | 36,142.80 | $ | 35,304.80 | $ | 28,614.00 |
| Wages - Janitors | $ | 44,854.89 | $ | 40,453.82 | $ | 45,473.70 |
| Security (night watchmen) | $ | 31,461.20 | $ | 34,440.33 | $ | 27,196.96 |
| Directors' Fees | $ | 1,200.00 | $ | 700.00 | $ | - |
| Executive Committee Fees | $ | 12,000.00 | $ | 7,000.00 | $ | - |
| FICA - Employer Portion | $ | 12,386.55 | $ | 10,093.42 | $ | 10,590.77 |
| Medicare - Employer Portion | $ | 2,896.85 | $ | 2,820.93 | $ | 2,476.88 |
| Unemployment - Federal | $ | 699.68 | $ | 842.82 | $ | 642.82 |
| Workers Compensation | $ | 3,570.36 | $ | 4,959.74 | $ | 5,459.22 |
| Employees Hospitalization | $ | 9,493.00 | $ | 6,604.82 | $ | 8,054.28 |
| Unemployment-State | $ | 413.33 | $ | 1,242.00 | $ | 1,158.41 |
| TOTAL EMPLOYEE EXPENSES | $ | 229,243.11 | $ | 221,109.18 | $ | 199,201.04 |
| | | | | | | |
| Net Ordinary Income | $ | 580,180.88 | $ | 602,700.93 | $ | 577,312.49 |
| | | | | | | |
| **OTHER OPERATING EXPENSES:** | | | | | | |
| | | | | | | |
| Contract Office Cleaning | $ | 48,231.88 | $ | 48,357.72 | $ | 41,952.72 |
| Legal & Professional Fees | $ | 3,537.00 | $ | 2,700.00 | $ | 2,931.92 |
| Office Expense | $ | 9,998.62 | $ | 9,145.04 | $ | 8,828.39 |
| Taxes - Real Estate | $ | 31,132.70 | $ | 31,508.70 | $ | 32,999.06 |
| Taxes - Others | $ | 2,746.00 | $ | - | $ | 1,334.00 |
| Insurance | $ | 14,496.68 | $ | 13,946.77 | $ | 14,249.50 |
| Heat | $ | 197,388.67 | $ | 166,452.36 | $ | 184,637.62 |
| Electricity | $ | 165,387.72 | $ | 175,613.63 | $ | 157,216.75 |
| Water/Sewage | $ | 27,482.17 | $ | 36,799.00 | $ | 33,116.45 |
| Elevator Maintenance | $ | 53,310.08 | $ | 54,998.23 | $ | 38,554.55 |
| Building Repairs | $ | 24,613.32 | $ | 33,506.67 | $ | 43,212.33 |

E

| | | | | | |
|---|---|---|---|---|---|
| Janitor Supplies | $ | 11,503.79 | $ | 14,989.89 | $ | 9,379.83 |
| Electrical Supplies | $ | (933.80) | $ | (10.49) | $ | 1,281.44 |
| Small Tools & Equipment | $ | 888.00 | $ | 504.72 | $ | 580.27 |
| Rubbish Pick-up | $ | 9,684.19 | $ | 9,215.77 | $ | 9,365.05 |
| Paint & Supplies | $ | 660.56 | $ | 2,557.52 | $ | 159.61 |
| Window Washing - Outside Cont. | $ | 4,508.05 | $ | 4,803.75 | $ | 4,632.15 |
| Janitorial Service - Contract | $ | 467.74 | $ | 1,598.59 | $ | 1,704.50 |
| Boiler Expense | $ | 11,136.66 | $ | 11,560.47 | $ | 2,895.16 |
| Advertising | $ | 506.80 | $ | 957.04 | $ | 790.71 |
| Charitable Contributions | $ | 150.00 | $ | - | $ | - |
| Dues & Fees | $ | 956.00 | $ | 1,388.00 | $ | 950.00 |
| Incidentals | $ | (2.00) | $ | 261.50 | $ | - |

| | | | | | |
|---|---|---|---|---|---|
| TOTAL OTHER OPERATING EXPENSES | $ | 617,850.83 | $ | 620,854.88 | $ | 590,772.01 |

| | | | | | |
|---|---|---|---|---|---|
| OPERATING INCOME | $ | (37,669.95) | $ | (18,153.95) | $ | (13,459.52) |

OTHER REVENUE:

| | | | | | |
|---|---|---|---|---|---|
| Interest Earned | $ | 25.53 | $ | - | $ | - |
| Misc. Revenue | $ | 124.88 | $ | 417.35 | $ | 314.71 |
| Profit / Loss on Investment | $ | 2,849.00 | $ | - | $ | - |
| Discounts Earned | $ | 723.82 | $ | - | $ | - |

| | | | | | |
|---|---|---|---|---|---|
| TOTAL OTHER REVENUE | $ | 3,723.23 | $ | 417.35 | $ | 314.71 |

OTHER EXPENSES:

| | | | | | |
|---|---|---|---|---|---|
| Depr - Bldg. Improvement | $ | 5,256.00 | $ | - | $ | - |
| Depr - Equipment & Fixtures | $ | 4,012.00 | $ | - | $ | - |
| Depr - Tenant Improvements | $ | 7,111.11 | $ | 14,419.20 | $ | 12,687.26 |
| Depr - Furniture & Fixtures | $ | 310.00 | $ | - | $ | - |
| Misc. Expense | $ | 4,751.29 | $ | 689.42 | $ | 4,928.02 |
| Interest Expense | $ | 114.88 | $ | 1,326.19 | $ | 675.57 |

| | | | | | |
|---|---|---|---|---|---|
| TOTAL OTHER EXPENSES | $ | 21,555.28 | $ | 16,434.81 | $ | 18,290.85 |

| | | | | | |
|---|---|---|---|---|---|
| NET PROFIT BEFORE INCOME TAX | $ | (55,502.00) | $ | (34,171.41) | $ | (31,435.66) |

NET INCOME (LOSS)

Income / Expense Spitzer Building Only

|      |     | Income  | Expense | Profit/Loss |
|------|-----|---------|---------|-------------|
| 2009 | Yr  | 589,372 | 517,414 | 71,958      |
| 2010 | Yr  | 458,542 | 509,019 | (50,477)    |
| 2011 | Jan | 38,383  | 21,145  | 17,238      |
|      | Feb | 38,723  | 45,152  | (6,429)     |
|      | Mar | 37,112  | 60,156  | (23,044)    |
|      | Apr | 38,259  | 39,316  | (1,057)     |
|      | May | 36,310  | 33,261  | 3,049       |
|      | Jun | 35,757  | 38,601  | (2,844)     |
|      | Jul | 37,104  | 40,389  | (3,285)     |
|      | Aug | 38,928  | 42,989  | (4,061)     |
|      | Sep | 38,476  | 46,640  | (8,164)     |
|      | Oct | 37,888  | 34,994  | 2,894       |
|      | Nov | 36,427  | 33,171  | 3,256       |
|      | Dec | 35,167  | 42,531  | (7,364)     |
| 2012 | Jan | 34,431  | 43,656  | (9,225)     |
|      | Feb | 32,712  | 42,076  | (9,364)     |
|      | Mar | 32,825  | 36,808  | (3,983)     |
|      | Apr | 33,238  | 38,629  | (5,391)     |
|      | May | 34,047  | 38,212  | (4,165)     |
|      |     |         |         | (40,458)    |

**Spitzer Building**
**Income and Expenses Estimated vs. Actual**
**For Year Ended December 31, 2009**
*Accrual Basis*

| | Estimated | Actual | Difference Over (Under) |
|---|---|---|---|
| Income: | | | |
| Rents Billed | $ 451,306 | $ 537,637 | 86,331 |
| Electric Billed | $ 70,000 | $ 51,769 | (18,231) |
| Total Income | $ 521,306 | $ 589,406 | 68,100 |
| Expenses: | | | |
| Employee Expenses (1) | $ 194,000 | $ 157,894 | (36,106) |
| Office Expenses (2) | $ 9,000 | $ 34,380 | 25,380 |
| Contract Expense (3) | $ 50,000 | $ 45,827 | (4,173) |
| Taxes Real Estate (5) | $ 26,000 | $ 26,000 | 0 |
| Building Insurance | $ 15,000 | $ 4,616 | (10,384) |
| Utilities | $ 207,000 | $ 271,037 | 64,037 |
| Management Fee | $ 26,065 | $ 7,817 | (18,248) |
| Repairs & Maintenance | $ 54,632 | $ 41,485 | (13,147) |
| Replacement Reserves (4) | $ 31,750 | $ 17,870 | (13,880) |
| Total Expenses | $ 613,447 | $ 606,926 | $ (6,521) |
| Net Income/(Loss) | $ (92,141) | $ (17,520) | (74,621) |

*(1) Actual Employee Expenses are calculated based upon estimated time spent on property.*

*(2) Office Expense includes telephone, internet, advertising, office supplies and other miscellaneous expenses.*

*(3) Includes Elevator Maintenance contract ($39,012) and trash removal ($6,815)*

*(4) Retubing of boiler*

*(5) Estimated based upon approved tax appeal*

3:18 PM
07/30/13
Accrual Basis

**Ergur Real Estate Group, Patrice Spitzer, Receiver**
**Profit & Loss**
**January 1, 2011 through July 30, 2013**

| | Jan - Dec 11 | Jan - Dec 12 | Jan 1 - Jul 30, 13 | TOTAL |
|---|---|---|---|---|
| **Ordinary Income/Expense** | | | | |
| **Income** | | | | |
| Discounts | -3,704.20 | 0.00 | 0.00 | -3,704.20 |
| Electric Billed | 45,476.02 | 39,204.25 | 17,751.06 | 102,431.33 |
| Rents Billed | 366,201.06 | 366,539.13 | 202,272.24 | 935,012.43 |
| Uncategorized Income | 72,168.97 | 735.45 | 0.00 | 72,904.42 |
| Water Billed | 2,166.25 | 1,904.63 | 929.09 | 4,999.97 |
| **Total Income** | 482,308.10 | 408,383.46 | 220,952.39 | 1,111,643.95 |
| **Gross Profit** | 482,308.10 | 408,383.46 | 220,952.39 | 1,111,643.95 |
| **Expense** | | | | |
| Bad Debt Expense | 17,175.85 | 18,415.04 | 150.00 | 35,740.89 |
| Fire Watch Costs | 0.00 | 0.00 | 5,592.00 | 5,592.00 |
| Medical / Life Insurance | 12,390.42 | 15,676.82 | 9,728.21 | 37,795.45 |
| Over/Short | 20.00 | 51.53 | 94.78 | 166.31 |
| Payroll Taxes | 49,963.58 | 49,690.90 | 27,041.48 | 126,695.96 |
| Payroll Wages Maintenance | 25,024.92 | 27,191.12 | 14,597.97 | 66,814.01 |
| Payroll Wages Office | 12,942.31 | 12,363.02 | 6,764.54 | 32,069.87 |
| Payroll Wages Sec. & Jan. | 81,722.10 | 82,017.36 | 50,805.30 | 214,544.76 |
| penalties | 609.10 | 0.00 | 0.00 | 609.10 |
| Uncategorized Expenses ✱ | 392,835.91 | 0.00 | 404.00 | 393,239.91 |
| Utilities - Water / Sewage NB | 795.14 | 0.00 | 997.80 | 1,792.94 |
| Worker's Comp. | 2,300.98 | 4,591.81 | -465.39 | 6,427.40 |
| **Total Expense** | 595,780.31 | 209,997.60 | 115,710.69 | 921,488.60 |
| **Net Ordinary Income** | -113,472.21 | 198,385.86 | 105,241.70 | 190,155.35 |
| **Other Income/Expense** | | | | |
| **Other Expense** | | | | |
| Advertising | 140.00 | 0.00 | 0.00 | 140.00 |
| Bank Charges | 135.50 | -37.50 | 62.50 | 160.50 |
| Boiler Expense | 2,849.40 | 2,684.90 | 2,734.12 | 8,268.42 |
| Elevator Expense | 24,350.76 | 24,024.24 | 14,014.14 | 62,389.14 |
| Fire Protection | 1,563.89 | 0.00 | 0.00 | 1,563.89 |
| Janitorial Supplies | 510.18 | 289.72 | 350.15 | 1,150.05 |
| Legal & Professional Fees | 4,141.38 | 3,349.38 | 1,355.21 | 8,845.97 |
| Office Expense | 1,347.48 | 1,372.95 | 217.56 | 2,937.99 |
| Pest Control Expense | 1,086.80 | 1,265.69 | 701.26 | 3,053.75 |
| Repair & Maintenance | 9,570.93 | 8,615.67 | 4,428.89 | 22,615.49 |
| Telephone / Internet Expense | 3,105.44 | 3,311.16 | 1,842.45 | 8,259.07 |
| Trash Removal | 9,968.51 | 10,627.77 | 6,715.69 | 27,311.97 |
| Utilities - Electric (SB) | 87,284.04 | 78,753.38 | 43,063.14 | 209,100.56 |
| Utilities - Gas (NB) | 116.35 | 0.00 | 0.00 | 116.35 |
| Utilities - Gas (SB) | 115,992.86 | 77,331.61 | 50,766.00 | 244,090.47 |
| Utilities - Water / Sewage SB | 24,133.72 | 17,555.66 | 5,078.72 | 46,768.10 |
| **Total Other Expense** | 286,297.24 | 229,144.65 | 131,329.83 | 646,771.72 |
| **Net Other Income** | -286,297.24 | -229,144.65 | -131,329.83 | -646,771.72 |
| **Net Income** | -399,769.45 | -30,758.79 | -26,088.13 | -456,616.37 |

✱ + 392,835.91

− 6933.54

✱ Removed entry created when A/P invoices were entered from old Quickbooks Online System

Page 1

Form Approved OMB No. 2502-0265

| A. U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT | B. TYPE OF LOAN |
|---|---|
| SETTLEMENT STATEMENT | 1. ☐ FHA   2. ☐ FMHA   3. ☐ CONV. UNINS |
| Louisville Title Agency for N.W. Ohio | 4. ☐ VA   5. ☐ CONV. INS. |
| 626 Madison Avenue | 6. ESCROW FILE NUMBER: 00299756-001 PM   7. LOAN NUMBER: |
| Toledo, OH 43604 (419) 248-4611 **FINAL** | 8. MORTGAGE INSURANCE CASE NUMBER: |

C. NOTE: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(P.O.C.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

D. NAME OF BORROWER: The EPE Spitzer Building, LLC

ADDRESS OF BORROWER:

E. NAME OF SELLER: The Spitzer Building Company

ADDRESS OF SELLER:

F. NAME OF LENDER:

ADDRESS OF LENDER:

G. PROPERTY LOCATION: 520 Madison Ave
Toledo, OH 43604
Lucas County OTI
Lot(s) 464 - 465 Sub, Lot 1-5 Port Lawrence

H. SETTLEMENT AGENT: Louisville Title Agency for N.W. Ohio
PLACE OF SETTLEMENT: 626 Madison Avenue, Toledo, OH 43604

| I. SETTLEMENT DATE: 1/5/2009 | PRORATION DATE: 1/5/2009 | DISBURSEMENT DATE: 1/5/2009 |
|---|---|---|



| J. SUMMARY OF BORROWER'S TRANSACTION | | K. SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| **100. GROSS AMOUNT DUE FROM BORROWER:** | | **400. GROSS AMOUNT DUE TO SELLER:** | |
| 101. Contract Sales Price | 800,000.00 | 401. Contract Sales Price | 800,000.00 |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement charges to Borrower (line 1400) | 3,850.50 | 403. Personal Property | 15,000.00 |
| 104. Personal Property | 15,000.00 | 404. Interest Jan. 5 thru Apr 13 | 12,386.11 |
| 105. Interest Jan 5 thru 4-13 | 12,386.11 | 405. | |
| ADJUSTMENTS FOR ITEMS PAID BY SELLER IN ADVANCE: | | ADJUSTMENTS FOR ITEMS PAID BY SELLER IN ADVANCE: | |
| 106. City/Town Taxes | | 406. City/Town Taxes | |
| 107. County Taxes | | 407. County Taxes | |
| 108. Assessments | | 408. Assessments | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| 113. | | 413. | |
| 114. | | 414. | |
| 115. | | 415. | |
| **120. GROSS AMOUNT DUE FROM BORROWER:** | 831,236.61 | **420. GROSS AMOUNT DUE TO SELLER:** | 827,386.11 |
| **200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER:** | | **500. REDUCTIONS IN AMOUNT DUE TO SELLER:** | |
| 201. Deposit or earnest money | 100,000.00 | 501. Excess deposit (see instructions) | 100,000.00 |
| 202. Principal amount of new loan(s) | | 502. Settlement charges to Seller (line 1400) | 32,802.50 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of first mortgage loan | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. Note from Seller | 727,386.11 | 506. Note from Seller | 727,386.11 |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| ADJUSTMENTS FOR ITEMS UNPAID BY SELLER: | | ADJUSTMENTS FOR ITEMS UNPAID BY SELLER: | |
| 210. City/Town Taxes | | 510. City/Town Taxes | |
| 211. County Taxes 12/20/08 to 01/05/09 | 1,446.53 | 511. County Taxes 12/20/08 to 01/05/09 | 1,446.53 |
| 212. Assessments | | 512. Assessments | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. TOTAL PAID BY/FOR BORROWER:** | 828,832.64 | **520. TOTAL REDUCTIONS IN AMOUNT DUE SELLER:** | 861,635.14 |
| **300. CASH AT SETTLEMENT FROM/TO BORROWER:** | | **600. CASH AT SETTLEMENT TO/FROM SELLER:** | |
| 301. Gross amount due from Borrower (line 120) | 831,236.61 | 601. Gross amount due to Seller (line 420) | 827,386.11 |
| 302. Less amount paid by/for Borrower (line 220) | 828,832.64 | 602. Less reduction in amount due Seller (line 520) | 861,635.14 |
| **303. CASH (☒ FROM ) ( ☐ TO ) BORROWER:** | 2,403.97 | **603. CASH ( ☒ FROM ) ( ☐ TO ) SELLER:** | 34,249.03 |



Item Image Print

| | | | | | | |
|---|---|---|---|---|---|---|
| **BusinessDate:** | 11 January 2008 | **ItemType:** | 2 | | **Bill Type:** | 041215621 |
| **DIN:** | 1001003769 | **Category:** | 21 | | **RL Batch** | 1117 |
| **TrackDIN:** | 3769 | **TransID:** | 3 | | **Treasurer** | |
| **RunNo:** | 1 | **Amount:** | $35,444.71 | | **BundleID:** | 100025 |
| **Worksource:** | 1 | **Amount Due:** | | | | |
| **SeqNo:** | 3769 | **Parcel Number:** | 2009645 | | | |



paid    25,638.67
         3 006.52
         3,196.95
         3,612.57
         —————
         $35,444.71



no check found for 61,113.08
on 1/11/08

